UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IVONNE DELGADO,<br><br>                Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                Defendant. | Civ. No. 20-283<br><br>**OPINION** |

THOMPSON, U.S.D.J.

## **INTRODUCTION**

This Social Security appeal comes before the Court to review, pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff Ivonne Delgado's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income benefits under Title XVI of the Social Security Act, § 1381 *et seq.* The Court has decided this matter based on the written submissions of the parties and without oral argument pursuant to Local Civil Rule 9.1(f). For the following reasons, the decision of the Commissioner is vacated and this case is remanded to the Commissioner for further administrative proceedings consistent with this Opinion.

1

# BACKGROUND

I.  **Procedural History**

Plaintiff is fifty-nine years old. (R. 63.)[1] She alleges that she became disabled on August 1, 2016. (R. 15.) Prior to her alleged disability onset date, Plaintiff worked as an administrative assistant at a law firm for twenty-seven years. (R. 242.) When she began frequently falling asleep at her desk, the law firm offered her early retirement, which she accepted. (R. 242.) After she left her job at the law firm, Plaintiff worked in retail positions for short periods of time. (R. 34–35.) Her last employment was in 2018, when she worked at a grocery store for one week. (R. 35.)

On February 14, 2017, Plaintiff applied for disability insurance benefits and supplemental security income. (R. 15.) Her application stated that she was disabled due to sleep apnea. (R. 65.) Her claim was denied on June 20, 2017. (R. 99.) Plaintiff filed for reconsideration and alleged that she was also disabled due to inflammation in her finger joints and shoulders. (R. 79.) Plaintiff's request for reconsideration was denied on September 21, 2017. (R. 106, 109.) Plaintiff then requested a hearing, which was held on March 11, 2019 before an Administrative Law Judge ("ALJ"). (R. 15.) In a decision issued on May 15, 2019, the ALJ denied Plaintiff's application. (R. 12.) On November 5, 2019, the Appeals Council denied Plaintiff's request for review. (R. 1.) Therefore, the ALJ's decision is the final action by the Commissioner.

On January 1, 2020, Plaintiff appealed the Commissioner's decision to this Court by filing a Complaint. (ECF No. 1.) Plaintiff submitted a brief to the Court on May 11, 2020. (ECF No. 8.) The Commissioner submitted a responsive brief (ECF No. 9), and Plaintiff replied (ECF No. 10). Plaintiff's appeal is presently before the Court.

---

[1] Citations to "(R. ___)" refer to the certified Administrative Record provided by Defendant Commissioner pursuant to Local Civ. R. 9.1(c)(1).

**II. Medical Evidence**

   A.   *Plaintiff's Treatment History*

On April 27, 2017, Plaintiff sought treatment from Dr. Mohamed Islam at the Jewish Renaissance Medical Center for bilateral arm pain, muscle cramps, and muscle aches that started about six months before. (R. 302–06.) Dr. Islam found that pain was elicited with lateral movement of Plaintiff's arms. (R. 304.) He diagnosed Plaintiff with left and right arm pain and obesity, and referred Plaintiff to physical therapy. (R. 304–05.) About two months later, Plaintiff saw Dr. Islam again due to inflammation in her right pinky. (R. 318.) Dr. Islam recommended that Plaintiff take ibuprofen as needed. (R. 321.)

On June 12, 2017, Dr. Francky Merlin evaluated Plaintiff. (R. 297.) Plaintiff told Dr. Merlin that she had been diagnosed with sleep apnea seven years ago, and that she uses a continuous positive airway pressure machine to sleep. (R. 297.) Dr. Merlin diagnosed Plaintiff with sleep apnea. (R. 298.) He noted no abnormalities in her gait, and found that her grasping strength, manipulative functions, and reflexes were normal. (R. 298.) He noted some tenderness in right shoulder but found the range of motion in her shoulder to be normal. (R. 298.)

On June 29, 2017, Plaintiff attended a physical therapy evaluation with Dr. Steve Tserlin, DPT. (R. 338.) Dr. Tserlin found that Plaintiff exhibited tenderness upon palpitation of her right shoulder, right knee, and right pinky. (R. 338–39.) He recommended that Plaintiff attend physical therapy three times per week for four weeks. (R. 339.) Dr. Tserlin completed a General Medical Report in which he stated that the maximum Plaintiff could lift was fifteen pounds and the maximum she could push or pull was less than twenty pounds. (R. 348.) He also stated that Plaintiff could stand up to six hours per day and sit up to eight hours per day. (R. 348.)

On June 13, 2018, Dr. Marc Silberman examined Plaintiff after she complained of pain in her hands and arms and a deformity in her hand joints. (R. 397.) On the same day, Dr. Silberman wrote in a letter to Dr. Islam that Plaintiff had a "[rheumatoid arthritis] appearance to her hands . . . with swan and recurvatum and swelling deformities." (R. 428.) He prescribed Celebrex, a nonsteroidal anti-inflammatory drug. (R. 398.) On a follow-up visit to Dr. Silberman, Plaintiff stated that she could not work at a deli because of weakness in her hands. (R. 394.) Dr. Silberman found no evidence of atrophy and negative Tinel's and Phalen's signs, which are used to detect carpal tunnel syndrome. (R. 392, 395.)[2] After this visit, Dr. Silberman wrote that it was his impression that Plaintiff had "Probable Seronegative Rheumatoid Arthritis." (R. 429.)[3] He recommended that Plaintiff use a splint, modify her activity, and try herbal nutritional remedies. (R. 429.) In a letter dated August 6, 2018, Dr. Silberman wrote that Plaintiff was "unable to work due to right hand and left hand inflammation, deformity, [and] seronegative rheumatoid arthritis." (R. 365.)

On another follow-up visit on September 17, 2018, Plaintiff complained of foot and toe pain and swelling. (R. 388.) Dr. Silberman noted that Plaintiff had an antalgic gait. (R. 389.)[4] He wrote that she reported no pain or swelling in other joints apart from her toes, arms, wrists,

---

[2] Tinel's and Phalen's signs are determined by measuring how quickly a patient feels numbness and tingling in the fingers upon certain movements. *Carpal Tunnel Syndrome*, Cleveland Clinic (Oct. 22, 2019), https://my.clevelandclinic.org/health/diseases/4005-carpal-tunnel-syndrome.

[3] Seronegative rheumatoid arthritis occurs when the patient experiences the symptoms of rheumatoid arthritis, but tests negative for rheumatoid arthritis indicators in the blood. *Understanding Rheumatoid Arthritis Lab Tests and Results*, Hospital for Special Surgery (Sept. 10, 2020), https://www.hss.edu/conditions_understanding-rheumatoid-arthritis-lab-tests-results.asp.

[4] Antalgic gait "refers to an abnormal pattern of walking secondary to pain that ultimately causes a limp, whereby the stance phase is shortened relative to the swing phase." Nadja Auerbach and Prassana Tadi, *Antalgic Gait in Adults*, National Center for Biotechnology Information (Jan. 31, 2021), https://www.ncbi.nlm.nih.gov/books/NBK559243/.

hands, and fingers. (R. 388.) On the same day, Dr. Silberman signed a letter that deferred Plaintiff from an employment and training program. (R. 427.) He diagnosed Plaintiff with, among other things, seronegative rheumatoid arthritis, swan-neck deformity of the left and right hand, subluxation of the left and right thumb joints,[5] pain in her upper limb, an elevated erythrocyte sedimentation rate,[6] an elevated C-reactive protein,[7] swelling of toes on both feet, and synovial swelling of the toe joint.[8] (R. 389.)

On March 5, 2019, Dr. Silberman completed a Medical Source Statement. (R. 431.) Dr. Silberman stated that Plaintiff had musculoskeletal pain in her hands, wrists, fingers, feet, toes, and back. (R. 432.) He noted symptoms such as extremity numbness, pain, and/or tingling, fatigue, difficulty walking, muscle weakness, loss of manual dexterity, swelling, and anxiety. (R. 432, 434.) He stated that the Celebrex medication that Plaintiff sometimes took, which had side effects including drowsiness, dizziness, and nausea, would "place severe limitation on [Plaintiff's] ability to perform even the most simple work tasks." (R. 433.) He also stated that Plaintiff could never reach or handle with her right arm, could rarely reach or handle with her left arm, and could never finger with both hands. (R. 435.) He noted that Plaintiff would need supine rest at least three days per week and that she may sometimes need a cane or assistive device to walk. (R. 434, 436.) He stated that she could not even lift light items, and that she could stand

---

[5] Subluxation is the partial dislocation of a joint. *Dislocation*, Cleveland Clinic (July 8, 2018), https://my.clevelandclinic.org/health/diseases/17873-dislocation.
[6] Erythrocyte sedimentation rate ("ESR") "measures the rate of fall . . . of red blood cells . . . in a sample of blood placed in a tall vertical tube. Increased [ESR] indicates inflammation." *Sed Rate (Erythrocyte Sedimentation Rate or ESR) Test*, Cleveland Clinic (Mar. 14, 2018), https://my.clevelandclinic.org/health/diagnostics/17747-sed-rate-erythrocyte-sedimentation-rate-or-esr-test.
[7] The level of C-reactive protein in blood increases when there is inflammation in the body. *C-reactive protein test*, Mayo Clinic (Nov. 21, 2017), https://www.mayoclinic.org/tests-procedures/c-reactive-protein-test/about/pac-20385228.
[8] "Synovitis is the inflammation of a synovial (joint-lining) membrane." *Synovitis*, HealthCentral (Mar. 30, 2019), https://www.healthcentral.com/condition/synovitis.

for less than one hour and sit for less than four hours. (R. 436.) He also opined that Plaintiff's impairments would cause her to be absent from any employment for more than four days per month. (R. 437.)

On December 18, 2018, Plaintiff visited Dr. Rodolfo Maldonado, who diagnosed her with mixed sleep apnea, among other conditions. (R. 440.) Dr. Maldonado's treatment notes indicate that he diagnosed Plaintiff with "multiple joint pain" on September 10, 2018. (R. 440.)

B. *Self-Assessments and Other Opinions*

At her hearing with the ALJ, Plaintiff testified that she was no longer able to work due to pain and cramping in her hands. (R. 38.) She stated that she was developing pain and arthritis in two of her toes and reported some shoulder pain and lower back pain after sitting for long periods of time. (R. 38.) Plaintiff stated that she could stand for about thirty minutes, walk for about two to three blocks, and lift about five pounds. (R. 39–41.) She testified that she could not type because of pain in her wrists and fingers but maintained that she could fasten some buttons, apply makeup, and prune her garden. (R. 42–43.) Plaintiff stated that she treated her pain with Celebrex, but only when her pain was particularly bad because the medication caused weight gain. (R. 47–48.) At the time of the hearing, Plaintiff wore braces on both of her wrists and her fingers were swollen. (R. 41.)

Plaintiff's daughter also completed a report summarizing, from her perspective, her mother's capabilities. (R. 291.) Plaintiff's daughter characterized her mother's condition as "deteriorating," and stated that Plaintiff suffered pain doing simple chores. (R. 291.) She reported that Plaintiff could not carry anything over five pounds. (R. 291.)

## LEGAL STANDARDS

### I. Disability Determination by the Commissioner

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To show disability, a claimant must "furnish[] such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." § 423(d)(5)(A).

The Commissioner employs a five-step sequential evaluation process for disability claims. *See generally* 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). The threshold inquiry in this process is (1) whether the claimant has engaged in any substantial gainful activity since her alleged disability onset date. § 404.1520(a)(4)(i). If the claimant has not, the Commissioner considers (2) whether the claimant has any impairment or combination of impairments that is "severe," such that it limits the claimant's "physical or mental ability to do basic work activities." §§ 404.1520(b)–(c), 404.1521. If the claimant has a severe impairment, the Commissioner then examines the objective medical evidence to determine (3) whether the impairment matches or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). §§ 404.1520(d), 404.1525, 404.1526. If so, the claimant is eligible for disability benefits. § 404.1520(d). If not, (4) the Commissioner assesses the claimant's residual functional capacity ("RFC"), which is the claimant's remaining ability to work given her impairments. § 404.1520(e). Comparing the RFC with the requirements of past relevant work, the Commissioner determines whether the claimant has satisfied her burden of establishing that she is unable to return to her past relevant work. §§

404.1520(f), 404.1560(b); *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007). If the claimant meets this burden, the burden shifts to the Commissioner to show (5) whether other work exists in significant numbers in the national economy that the claimant could perform given her medical impairments, age, education, past work experience, and RFC. § 404.1520(g); *Poulos*, 474 F.3d at 92. If such work does not exist, the claimant is deemed disabled. § 404.1520(g)(1).

## II. District Court Standard of Review

Section 405(g) empowers district courts to "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).[9] In reviewing the ALJ's decision, the court reviews questions of law de novo and questions of fact under a "substantial evidence" standard of review. *Id.*; *Poulos*, 474 F.3d at 91. "Substantial evidence is defined as 'more than a mere scintilla;' it means 'such relevant evidence as a reasonable mind might accept as adequate.'" *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer*, 186 F.3d at 427). Where the Commissioner's factual findings are supported by substantial evidence in the record, they are considered conclusive even though the Court might have decided the inquiry differently. § 405(g); *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). However, the Commissioner must "analyze[] all evidence and . . . sufficiently explain[] the weight he has given to obviously probative exhibits." *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978); *accord Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000).

---

[9] The final determination of the Commissioner regarding supplemental security income benefits is also "subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3).

8

# DISCUSSION

I. **The ALJ's Decision**

At Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 1, 2016. (R. 18.) At Step Two, the ALJ found that Plaintiff's arthritis in her hands and feet, sleep apnea, and obesity were severe impairments. (R. 19.) The ALJ determined that Plaintiff's gastroesophageal reflux disease[10] and anxiety were not severe impairments. (R. 19.)

At Step Three, the ALJ found that none of Plaintiff's impairments or combination of impairments met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18.) The ALJ concluded that Plaintiff's claim of rheumatoid arthritis did not meet the criteria of Listing 14.09. (R. 18.) The ALJ also found that Plaintiff's sleep apnea did not meet the criteria of Listing 3.10, because the medical evidence failed to establish the required clinical conditions. (R. 18.) Finally, the ALJ noted that he considered Plaintiff's obesity on its own and in combination with her other impairments. (R. 19.)

At Step Four, the ALJ concluded that:

> [Plaintiff] has the [RFC] to perform light work . . . except that [Plaintiff] can never climb ropes, ladders, or scaffolds; she can never be exposed to unprotected heights or hazardous machinery; she can occasionally climb stairs and ramps; she can never crawl; she can occasionally stoop and crouch. [Plaintiff] is limited to occasional reaching overhead and frequent reaching in all other directions; frequent fingering and handling. She is limited to frequently balancing.

(R. 19.) In reaching this conclusion, the ALJ first evaluated Plaintiff's treatment history. (R. 19–20.) The ALJ concluded that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the

---

[10] "Gastroesophageal reflux disease (GERD) occurs when stomach acid frequently flows back into the tube connecting your mouth and stomach." *Gastroesophageal reflux disease (GERD)*, Mayo Clinic (May 22, 2020), https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940.

intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 19.) The ALJ noted that despite an alleged onset date of August 1, 2016, there was "very little evidence of treatment for her alleged impairments," and "no evidence of any treatment at her alleged onset date." (R. 20.)

The ALJ then considered the opinions and statements regarding Plaintiff's impairments and abilities. The ALJ afforded Dr. Merlin's assessment "limited weight" because it did not include any functional limitations, but stated that Dr. Merlin's assessment "shows [Plaintiff's] functioning was much higher than alleged." (R. 20.) The ALJ also afforded Dr. Tserlin's first assessment "limited weight" because it included some limitations on Plaintiff's capabilities but did not explain them; the ALJ placed "more weight" on Dr. Tserlin's second assessment because it was consistent with the rest of the record. (R. 20.) Finally, the ALJ afforded Dr. Silberman's statements "limited weight" and "little weight." (R. 20.) The ALJ found that Dr. Silberman's statement that Plaintiff was unable to work due to the arthritis in her hands to be "very vague" and "not supported by the record." (R. 20–21.) The ALJ also concluded that Dr. Silberman's opinion in the Medical Source Statement that Plaintiff "cannot even perform sedentary activities" was unsupported by his own treatment notes. (R. 21.)

The ALJ afforded some weight to the opinions of state agency consultants, who did not find that Plaintiff had any severe impairments. (R. 21.) Finally, the ALJ afforded the statement of Plaintiff's daughter "partial weight" because it provided "some insight into [Plaintiff's] daily living," but found that "the record does not support the [five-] pound lifting limitation, in light of [Plaintiff's] normal muscle functioning." (R. 21.) After considering Plaintiff's medical records, the opinion evidence, and Plaintiff's self-identified limitations, the ALJ concluded that Plaintiff's impairments allow her to perform "light work" with some additional limitations. (R. 21–22.)

The ALJ then concluded that Plaintiff could perform her past relevant work as a legal assistant. (R. 22.) In making this determination, the ALJ relied on the testimony of a vocational expert, to whom the ALJ posed several hypothetical questions at Plaintiff's hearing. (R. 22.) The vocational expert testified that a legal assistant job can be performed with Plaintiff's physical limitations. (R. 22.) For these reasons, the ALJ concluded that Plaintiff is not disabled. (R. 22.)

## II.     Plaintiff's Grounds for Appeal

Plaintiff raises three main objections to the ALJ's decision: (1) the ALJ failed to address her degenerative disc disease and degenerative joint disease of the knees at Step Two and in the RFC determination; (2) the ALJ failed to assign appropriate limitations to her handling and fingering in the RFC determination; and (3) the ALJ failed to appropriately address her obesity. (Pl.'s Br. at 1, ECF No. 8.)

### A.     *Degenerative Disc Disease and Degenerative Joint Disease*

Plaintiff alleges that she suffers from degenerative joint disease and degenerative disc disease, conditions that cause pain in both of her knees and in her back. (*Id.* at 12.) Plaintiff argues that the ALJ's failure to address her back and knee pain at Step Two and in the RFC determination warrants remand. (*Id.* at 12–13.)

The burden of showing a medically determinable impairment rests with the plaintiff. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). To be medically determinable, an impairment must be an "anatomical, physiological, or psychological abnormalit[y] that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. "[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source." *Id.* This includes medical signs, laboratory findings, or both. § 404.1529(b). A "symptom" is not a "medically determinable physical or mental impairment," and "no symptom

by itself can establish the existence of such an impairment." SSR 96-4p, 1996 WL 374187, at *1 (July 2, 1996). A plaintiff's own statements "of symptoms, a diagnosis, or a medical opinion" are not used to "establish the existence of an impairment[]." § 404.1521.

Here, there is no objective medical evidence from an acceptable medical source indicating that Plaintiff suffered from degenerative disc disease or degenerative joint disease. Although Plaintiff self-reported knee pain in her Adult Function Report and testified to some back pain at her hearing (R. 38, 252–59), not one of the physicians or therapists who examined Plaintiff diagnosed her with degenerative disc disease or degenerative joint disease. (*See generally* R. 297–443.) For instance, Plaintiff complained of knee pain to Dr. Tserlin and told him that she had previously undergone cortisone injections to her knees. (R. 338.) Dr. Tserlin noted that Plaintiff's right knee was tender upon palpitation. (R. 338.) But Dr. Tserlin did not diagnose Plaintiff with degenerative joint disease, and there is no medical record of any past cortisone shots. (*See* R. 338–39.) Similarly, in Dr. Silberman's Medical Source Statement, he stated that Plaintiff experienced back pain, among other forms of musculoskeletal pain. (R. 432.) But Dr. Silberman did not diagnose Plaintiff with degenerative disc disease or treat her for back pain; rather, he repeatedly indicated in his treatment notes that the only joint pain Plaintiff suffered was in her arms, wrists, hands, fingers, and toes. (*See* R. 388–99, 422–38.) Finally, Dr. Silberman reported during one of Plaintiff's visits that Plaintiff had an antalgic gait. (R. 389.) Plaintiff implies that this was caused by knee and back pain. (*See* Pl.'s Br. at 12.) But Dr. Silberman's notes indicate that Plaintiff's antalgic gait was due to swelling in her feet and toes from the arthritis for which she was seeking treatment, not due to knee or back pain. (R. 388.)

The Court therefore concludes that Plaintiff has not met her burden of showing that her alleged degenerative disc disease and degenerative joint disease were medically determinable

impairments. Because the ALJ is only required to consider medically determinable impairments, *see* 20 CFR §§ 404.1521, 404.1545(a)(2), the ALJ's failure to consider Plaintiff's degenerative disc disease and degenerative joint disease was not in error.

      B.      *Handling and Fingering Limitations*

Plaintiff also contends that the ALJ's finding that Plaintiff could perform frequent handling and fingering was not supported by substantial evidence. (Pl.'s Br. at 13.) Plaintiff points to her history of inflammation in her hands and fingers as evidence that the ALJ's assessment of her handling and fingering capabilities was in error. (*Id.* at 13–14.)

At Step Two, the ALJ found that Plaintiff's arthritis in her hands and feet was a severe impairment that significantly limited her ability to perform basic work activities. (R. 18.) The ALJ then considered Plaintiff's arthritis when assessing her RFC, and concluded that Plaintiff's "recent exacerbation of [arthritis] symptoms does not preclude her from performing a reduced range of light exertional tasks." (R. 21.) Ultimately, the ALJ concluded that Plaintiff could perform light work with additional limitations that incorporated "her subjective pain complaints." (R. 22.)

The Court finds that the ALJ's RFC determination is supported by substantial evidence in the record. First, during Plaintiff's consultative examination on June 12, 2017, Plaintiff did not report any wrist or hand pain, and Dr. Merlin found that her grasping strength and manipulative functions were not impaired. (R. 290.) Second, Dr. Tserlin, who treated Plaintiff after she began to report arthritic pain, found that Plaintiff had no limitation regarding handling objects. (R. 348.) Third, Dr. Silberman found that Plaintiff's arthritis responded to treatment with Celebrex and splinting. (R. 392, 395, 430.) He also found no evidence of atrophy. (R. 389, 392, 395, 398.) Fourth, Plaintiff's self-reported activities—including fastening buttons, preparing light meals,

13

applying makeup, and pruning her garden—reflected her ability to frequently handle and finger. (R. 42–43, 254, 256.)

The fact that Dr. Silberman opined that Plaintiff was extremely limited in handling and fingering in his Medical Source Statement does not alter this conclusion. Although opinions from treating physicians regarding the nature and severity of an impairment are accorded significant presumptive weight, such opinions "are not automatically entitled to controlling weight." *Dula v. Barnhard*, 129 F. App'x 715, 718 (3d Cir. 2005) (citing 20 C.F.R. §§ 404.152(d)(2), 416.927(d)(2)). Specifically, "the opinion of a treating physician is only entitled to controlling weight if it is well supported by medically acceptable clinic and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." §§ 404.1527(c), 416.927(c). When faced with conflicting medical opinions, the ALJ "is not only entitled but required to choose between them." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). At the same time, the ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429).

The ALJ did not discount Dr. Silberman's Medical Source Statement "for no reason or for the wrong reason." *See Morales*, 225 F.3d at 317. The ALJ explained that he afforded Dr. Silberman's Medical Source Statement "little weight," because it was inconsistent with the record as a whole, including the opinions of Dr. Tserlin, Dr. Islam, Dr. Merlin, and Dr. Silberman's own treatment notes. (R. 20–21.) Specifically, Dr. Silberman indicated that Plaintiff had "severe ambulatory limitations," and that she may need to use a cane. (R. 436.) However, Dr. Silberman only prescribed Plaintiff nutritional remedies, nonsteroidal anti-inflammatory drugs, and a splint as needed, with no recommendation for more intensive treatment. (*See* R. 390, 392, 395, 398, 428–30, 433.) Additionally, Dr. Silberman stated that Plaintiff suffered from

anxiety, but there is no indication anywhere in his treatment notes or in the rest of the record that Plaintiff experienced anxiety. (R. 434.) Accordingly, the ALJ's decision to afford Dr. Silberman's Medical Source Statement "little weight" was not in error. *See Dula*, 129 F. App'x at 719 (stating that an ALJ may discount a medical opinion if it is inconsistent with the provider's treatment notes).

For these reasons, the Court finds that the ALJ's determination that Plaintiff could perform frequent handling and fingering is supported by substantial evidence in the record.

C. *Obesity*

Finally, Plaintiff contends that the ALJ did not properly consider her obesity. Plaintiff argues that her obesity, combined with her other impairments, warranted greater limitations than the ALJ assessed. The Court notes from the outset that Social Security Ruling ("SSR") 02-1p applies to Plaintiff's appeal.[11]

Under SSR 02-1p, the ALJ must "meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, at step three and at every subsequent step." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). "Meaningful consideration requires an ALJ to 'clearly set forth the reasons for his decision'—including a 'discussion of the evidence' and an 'explanation of reasoning.'" *Weston v. Comm'r of Soc. Sec.*, 2019 WL 625559, at *4 (D.N.J. Feb. 13, 2019) (quoting *Diaz*, 577 F.3d at 504). "Conclusory statements that a condition does not constitute the medial equivalent of a listed impairment," for

---

[11] Social Security Ruling ("SSR") 19-2p applies to all Social Security applications filed on or after May 20, 2019, and to all claims pending before the agency on or after that date. SSR 19-2p, 2019 WL 2374244, at *5 n.14 (May 20, 2019). Plaintiff's hearing took place on March 11, 2019, and the ALJ issued his decision on May 15, 2019, before SSR 19-2p's effective date. (R. 12, 15.) In her brief, Plaintiff argues that SSR 19-2p applies to her appeal. (Pl.'s Br. at 15–16, ECF No. 8.) However, in her Reply, Plaintiff appears to concede that SSR 02-1p, the ruling in place at the time of her hearing, is the applicable standard. (Reply at 6, ECF No. 10.)

15

instance, "are insufficient." *Diaz*, 577 F.3d at 504. SSR 02-1p expressly acknowledges that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, crouching, and manipulating. *See* SSR 02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002).

Plaintiff did not allege disability based on obesity in her application, her reports to the agency, or at her administrative hearing. (R. 33–52, 227, 252–59, 261.) Still, at Step Two, the ALJ found that Plaintiff's obesity was a severe impairment that significantly limited Plaintiff's ability to perform basic work activities. (R. 18.) At Step Three, the ALJ noted that there was no specific Appendix listing for obesity and stated that obesity combined with Plaintiff's other impairments did not meet or equal one of the Appendix listings. (R. 19.)[12] Then, in making the RFC determination of light work, the ALJ stated that he

> considered all of the medical evidence of record and treatment notes received during the development of the record, in conjunction with the claimant's testimony and demeanor at the hearing, [to] conclude [that] the claimant's impairments, considered singly and in combination, result in the [RFC].

(R. 22.)

---

[12] When assessing Plaintiff's obesity at Step Three, the ALJ wrote,

> There is no listing for obesity; however, obesity may be a factor in both "meets" and "equals" determinations. The adjudicator will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. The adjudicator will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing; this is especially true of musculoskeletal, respiratory, and cardiovascular impairments. The adjudicator may also find that obesity, by itself, is medically equivalent to a listed impairment. The adjudicator will also find equivalence if an individual has multiple impairments, including obesity, no one [sic] of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment (SSR 02-1p).

(R. 19.)

16

The Court finds that the ALJ did not sufficiently consider Plaintiff's obesity at Steps Three and Four. After finding that Plaintiff's obesity was a severe impairment at Step Two, the ALJ provided only a conclusory statement assessing Plaintiff's obesity as Step Three, and a passing reference that Dr. Islam "noted [she was] obese," in the RFC determination. (R. 20.) Although the ALJ stated that he considered "all of [Plaintiff's] impairments singly and in combination" to reach his disability determination (R. 21), the ALJ's decision contains no analysis of how Plaintiff's obesity impacted, or did not impact, her other impairments. (*See* R. 20–22). The Court, therefore, cannot evaluate whether the ALJ's findings are supported by substantial evidence. *See Diaz*, 577 F.3d at 504 (declining to view the ALJ's reference to reports by the plaintiff's physicians as "constituting adequate, implicit treatment of [the plaintiff's obesity] by the ALJ" where obesity "was acknowledged by the ALJ [] as a severe impairment"); *Weston*, 2019 WL 625559, at *4 (remanding for further explanation when the ALJ concluded at Step Two that the plaintiff's obesity was a severe impairment and at Step Three stated only that she "fully considered obesity in the context of the overall record in making [her] decision"); *Rodriguez v. Comm'r of Soc. Sec.*, 2019 WL 397983, at *4 (D.N.J. Jan. 30, 2019) (remanding for further explanation when "the ALJ did not engage in a discussion of the evidence concerning [the plaintiff's] obesity nor did he explain how [the plaintiff's] obesity factored into his conclusions").

Furthermore, the Court cannot conclude that this error was harmless. Plaintiff's obesity is not borderline. Her body mass index ranged from thirty-seven to forty throughout her treatment history, and Dr. Maldonado diagnosed her as "severely obese." (R. 78, 83, 302, 307, 367, 379,

442).[13] Plaintiff's other severe impairments—sleep apnea and arthritis—are both impairments which may have been exacerbated by her obesity. *See Diaz*, 577 F.3d at 504; *see also* SSR 02-1p, 2002 WL 34686281, at *3, *6 (citing sleep apnea and arthritis as two conditions that may be exacerbated by obesity). And if the ALJ determines that Plaintiff's obesity, in combination with her other severe impairments, warrants additional limitations, then Plaintiff may not be capable of performing her past work as a legal assistant, which would require the ALJ's analysis to proceed to Step Five. Accordingly, the Court will remand this case to the ALJ for further explanations, clarifications, and proceedings as necessary.

## CONCLUSION

For the foregoing reasons, the Court vacates the ALJ's decision and remands this case to the Commissioner for further administrative proceedings consistent with this Opinion. An appropriate Order will follow.

Date: <u>April 29, 2021</u>   <u>*/s/ Anne E. Thompson*</u>
　　　　　　　　　　　　　　　　　　ANNE E. THOMPSON, U.S.D.J.

---

[13] A person with a body mass index ("BMI") of 30 or higher is considered obese, and a person with a BMI of 40 or higher is considered "extremely obese." *Obesity*, Mayo Clinic (Nov. 18, 2020), https://www.mayoclinic.org/ diseases-conditions/obesity/diagnosis-treatment/drc-20375749.